UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA

v.  CASE NO. 8:18-cr-328-T-23AEP

ABRAHAM LOPEZ MENDOZA,

    Defendant.
_____/

**DEFENDANT ABRAHAM LOPEZ MENDOZA'S SENTENCING MEMORANDUM**

    Comes now the Defendant, ABRAHAM LOPEZ MENDOZA, by and through undersigned counsel, and hereby files this Sentencing Memorandum in advance of the sentencing proceeding scheduled for November 16, 2018. Mr. Lopez Mendoza entered a plea of guilty to Count One of the Indictment charging him with conspiracy to possess with intent to distribute five kilograms or more of cocaine while on board a vessel subject to the jurisdiction of the United States in violation of 46 U.S.C. §§ 70503(a)(1), 70506 (a) and (b) and 21 U.S.C. § 960(b)(1)(B)(ii). (doc. 50). For the reasons set forth below, Mr. Lopez Mendoza prays the Court show leniency and sentence him to 120 months incarceration.[1]

**I. BACKGROUND**

    "It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment

---

[1] For his offense, Mr. Lopez Mendoza is subject to a ten year mandatory minimum sentence. However, should the Government file a motion recognizing his substantial assistance pursuant to 18 U.S.C. § 3553(e), Mr. Lopez Mendoza reserves the right to request a sentence of less than the mandatory minimum.

1

to ensue." *Pepper v. United States*, 131 S.Ct. 1229, 1240 (2011) (citing *Koon v. United States*, 518 U.S. 81, 113, 116 (1996)).  Mr. Lopez Mendoza has had a tragic life.  And, that tragedy has culminated in the foolish decision that places him now before the Court seeking mercy.

Mr. Lopez Mendoza is from a region in Mexico near the Arizona border.  His mother was just fifteen when she gave birth to him.  Mr. Lopez Mendoza's father was a brutal man.  He was a heavy drinker, used drugs, and abused his wife and children.  When Mr. Lopez Mendoza was about eight or nine years old, his parents separated.  Shortly after the separation, Mr. Lopez Mendoza's mother put him and his younger brother Elmer on a bus to Caborca, Mexico where his father lived.  When they arrived in Caborca, they had no way to contact their father so they lived on the street for over two weeks.  At just nine years old, Mr. Lopez Mendoza did his best to find food and protect himself and his brother, but he thought he and his brother would not survive.  It was a traumatic experience that still haunts him.  Eventually the police picked them up and housed them in jail where they were connected with their father.  Mr. Lopez Mendoza did not know why his mother made this decision, but likely she did not believe she could support the children.  Mr. Lopez Mendoza harbored a lot of resentment toward his mother for abandoning him and his brother in this way and also for forcing him to live with his father where he endured regular physical and verbal abuse.

Mr. Lopez Mendoza's father did not change his ways once Mr. Lopez Mendoza began living with him.  Mr. Lopez Mendoza still has a scar on his head from where his father kicked him with the heel of his boot.  The one positive in Mr. Lopez Mendoza's life was his brother Elmer.  They shared the ordeals posed by their parents and were very close.  They essentially raised themselves without much parental care.

Weary of being under his father's fist, Mr. Lopez Mendoza left home at the age of fifteen. He also began using marijuana regularly around this time. He was able to complete a vocational program and became an industrial welder. He married when he was just eighteen and started a family. Sadly, his first child passed away after being stung by a scorpion when she was just a year old. Mr. Lopez Mendoza held her as she convulsed and died in his arms. It is a memory he would not forget.

In an effort to flee from the pain caused by the death of his daughter, he began using cocaine. The stimulant provided some superficial relief of his depression over the loss of his daughter, but it did more harm than good. His drug use eroded his marriage, and his wife eventually left him.

Mr. Lopez Mendoza's brother Elmer continued to be his closest companion. They would do everything together. Elmer could identify with Mr. Lopez Mendoza's internal agony and provided strength and comfort. One night in 2000, Mr. Lopez Mendoza was out with his brother. While stopped in their car, they were ambushed by a group of gunmen who shot up the car. As they tried to pull Mr. Lopez Mendoza and his brother from the car, Mr. Lopez Mendoza was able to hit the accelerator and speed away. Having been shot five times, Mr. Lopez Mendoza was able to drive to a hospital. His brother did not survive the attack.

Mr. Lopez Mendoza believes the local mafia carried out his brother's murder in retaliation. Mr. Lopez Mendoza's brother was a journalist who followed the mafia's activities and took a lot of photographs. He likely came across something that resulted in his murder.

Mr. Lopez Mendoza took the death of his brother very hard. He was is best friend and closest family member. Mr. Lopez Mendoza believes that his brother's spirit continues to visit

him. During his incarceration for this case he is certain that his brother visited him to scold him for failing to save his mother's house, the circumstances of which will be discussed below.

As he had done previously to cope with personal strife, he turned to drugs. In addition to cocaine, he also began using methamphetamine, another stimulant. These "upper" drugs provided only fleeting relief.

Being shot was not Mr. Lopez Mendoza's only near death experience. When he was younger, he was dancing with a girl at a dance. Her boyfriend did not like it and stabbed him in the abdomen. Later in life, he was again stabbed in the abdomen during a robbery at a store where he was a customer.

Mr. Lopez Mendoza sought in-patient drug treatment twice in the years following his brother's death, once at Casa Hogar in Hermosillo, Mexico for three and a half months and later at Casa Nueva Viva in Baja, California for ten months. However, he continued to be haunted by his past and always returned to drugs. For years, he has struggled with depression and suicidal thoughts, and on occasion, actions. He sleeps just one to two hours a night and frequently used marijuana to fall asleep.

Mr. Lopez Mendoza has mostly worked as an industrial welder. He worked construction jobs in both Mexico and the United States. As evidenced by his immigration arrests for illegal entry into the United States, Mr. Lopez Mendoza spent a lot of time working in Tuscon, Arizona. It was, and still is, a common practice for people in his community to cross the border for work opportunities. He also worked maintenance at a plant performing electrical, plumbing, and other technical labor. Over his life he has worked many odd jobs due to the inconsistency of welding employment. Working also helped keep him from using drugs and

distracted him from the unrest in his life. He was a diligent worker and always provided for his family.

Over the span of about three years before his arrest in this case, Mr. Lopez Mendoza again went through personal turmoil that eventually resulted in this offense. Like his first wife, his long-time girlfriend of twenty years and their children left him due to his methamphetamine use. After the separation, he moved closer to his mother. He had reestablished a relationship with his mother who was helping him as he was really struggling with his personal demons. His mother encouraged him to take a job as a taxi driver, but in order to obtain the taxi he had to pledge collateral. His mother offered her home as the collateral and he began driving the taxi. During this time, his family became very concerned for him because he had attempted suicide. He agreed to enter an in-patient metal health clinic in Sonora, Mexico. Prior to doing so, he returned the taxi to the owner, but failed to get a receipt as proof that he returned the taxi. A short time later, the taxi owner claimed he never returned the taxi and initiated legal proceedings to foreclose on the collateral, his mother's home.

Mr. Lopez Mendoza felt cheated by the taxi owner, but had no money to defend against a legal proceeding. He became very distraught over putting his mother's home in peril. He conveyed that during this time his brother's spirt visited him and told him that he needed to protect his mother's home. Mr. Lopez Mendoza knew of a man who hung around construction sites where he worked who offered ways to make a lot of money, relatively speaking, in a short period of time. Mr. Lopez Mendoza was not naïve to the drug trade and knew what the man was offering. Mr. Lopez Mendoza agreed to become a mariner on a smuggling voyage. He

thought it was his only chance to save his mother's home. Like most of his life, it did not work out well for him.

## II. SENTENCING, 18 U.S.C. § 3553(a)

For the reasons discussed, Mr. Lopez Mendoza requests a variance to a sentence of 120 months. Although he is the rare "boat case" defendant with a criminal history category greater than one, a sentence in line with similarly sentenced defendants is warranted in this case.

### 1. *The Nature and Circumstances of the Offense, Section 3553(a)(1)*

As the Supreme Court recently reiterated, "the punishment should fit the offender and not merely the crime." *Pepper*, 131 S.Ct. at 1240 (citations omitted). As is the case with nearly every federal offense, the nature and circumstances of Mr. Lopez Mendoza's offense are serious. And, at the time he agreed to take the trip, he did not fully appreciate the seriousness. From Mr. Lopez Mendoza's perspective, he was simply riding on a boat from point A to point B. That type of rationalization is easier to accept in one's mind at a time of personal strife. Desperation to help his mother clouded his judgment. His decision was neither wise nor commendable, but the judgments of desperate people are often regrettable. Under Section 3553(a) a sentencing court may properly consider a defendant's motive in mitigation of the sentence. *United States v. Ranum*, 2005 WL 161223, *5 (E.D.Wis. 2005) (citing *Wisconsin v. Mitchell,* 508 U.S. 476, 485 (1993)).

### 2. *The History and Characteristics of the Defendant, Section 3553(a)(1)*

Mr. Lopez Mendoza's history is a sad one, built upon one tragedy after the next. He has struggled with mental health and addiction which ultimately contributed to his offense. If a person's "immediate misconduct" should ever be "assessed in the context of his overall life

6

hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance." *United States v. Adelson*, 441 F.Supp.2d 506, 513-514 (S.D.N.Y. 2006).

Childhood trauma has long been known to raise a person's odds of developing depression and addiction. Maia Szalavitz, *How Childhood Trauma May Make the Brain Vulnerable to Addiction, Depression,* TIME HEALTHLAND, Aug. 1, 2012. A study by the researchers at the University of Texas found that maltreated children had either a diagnosable drug problem or depression or both, three times the rate seen in controls. *Id*. This adds to the already voluminous literature which suggests that addiction problems have more to do with people's attempts to manage or flee pain than to satisfy their desire to seek pleasure. *Id*. For example, research has found that "[b]rain conditions may alter addiction vulnerability independently of drug history." R. Andrew Chambers, MD, et. al., *Neonatal Amygdala Lesions: Co-Occurring Impact on Social/Fear-Related Behavior and Cocaine Sensitization in Adult Rats*, LABORATORY FOR TRANSLATIONAL NEUROSCIENCE OF DUAL DIAGNOSIS AND DEVELOPMENT, INST. OF PSYCHIATRIC RES., DEPT. OF PSYCHIATRY, IND. U. SCH. OF MED.; BEHAVIORAL NEUROSCIENCE, Vol 121, No. 6. "Early emotional trauma, paired with a certain genetic background, may alter the early development of neural networks intrinsic to the amygdala, resulting in a cascade of brain effects and functional changes that present in adulthood as a dual-diagnosis disorder [of drug addiction and a mental ailment such as depression]." *Id*. As indicated in Mr. Lopez Mendoza's psychological evaluation, he has a dual diagnosis disorder.

In *Pepper v. United States,* 131 S.Ct. 1229, 1236 (2011), the Supreme Court commented that "rehabilitation may plainly be relevant to the history and characteristics of the defendant."

*Id.* at 1242. While Mr. Lopez Mendoza bears his own share of responsibility for the path he has taken, it is evident that he has experienced a great deal of trauma that was out of his control. For that, he is not beyond rehabilitation. Drug treatment and counseling to help him overcome depression, PTSD and whatever continues to draw him to self-destructive conduct would make a significant difference in his likelihood of recidivism. *See* Doug McVay, Vincent Schiraldi, & Jason Ziedenberg, *Treatment or Incarceration: National and State Findings on the Efficacy of Cost Savings of Drug Treatment Versus Imprisonment* (March 2004), Justice Policy Institute Policy Report ("Dollar for dollar, treatment reduces the societal costs of substance abuse more effectively than incarceration does."). Rehabilitative treatment, rather than extra imprisonment, will be a far more effective sentence for Mr. Lopez Mendoza.

3. *The Need for the Sentence Imposed to Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment for the Offense, Section 3553(a)(2)(A)*

Without question, at the time of his offense, Mr. Lopez Mendoza did not appreciate the consequences of his offense, and never imagined he would find himself in a United States prison. Mr. Lopez Mendoza could have no greater respect for the law than at this moment. And, although Mr. Lopez Mendoza has little knowledge of the United States legal system nor any allegiance to this country, he has always been respectful of the process, respectful and courteous to his attorney and the agents with whom he met, and has been a model inmate.

Mr. Lopez Mendoza is frightened about what the future holds, and he is heartbroken that he has left his family to subsist without his help. A just punishment in this situation must take into account that Mr. Lopez Mendoza has also been punished in ways other than the traditional prison sentence. He will be incarcerated in a foreign country where he knows no one.

He has essentially been cut off from his family and friends. His family will likely never visit him during his incarceration. And, when he is eventually released, he has no assurances that his family will be waiting for him. As an example of his difficult transition, a fellow inmate at the Pinellas County Jail swindled him out of what little commissary money he had because Mr. Lopez Mendoza was unfamiliar with the commissary system. Mr. Lopez Mendoza will be severely punished for his offense, and a sentence greater than 120 months will not affect any significant public interest.

    4. *The Need for the Sentence Imposed to Afford Adequate Deterrence to Criminal Conduct, Section 3553(a)(2)(B)*

Deterrence to Mr. Lopez Mendoza and the community at large is an important societal concern. However, there is no reason to believe that a sentence of more than 120 months will have any greater deterrent effect than a sentence of 120 months. An outsider viewing Mr. Lopez Mendoza's situation would not conclude he escaped penalty simply because he received the same sentence as similarly situated defendants. Certainty of punishment is a much better deterrent than severity. *See* Steven N. Durlauf & Daniel S. Nagin, *Imprisonment and Crime: Can Both be Reduced?*, 10 Criminology & Pub. Pol'y 13, 37 (2011) (deterrence is achieved with certainty of punishment, not its severity); *see also* Raymond Pasternoster, *How Much Do We Really Know About Criminal Deterrence*, 100 J. Crim. L. & Criminology 765, 817 (2010)([I]in virtually every deterrence study to date, the perceived certainty of punishment was more important than the perceived severity).

The Government's interest in discouraging people like Mr. Lopez Mendoza from participating in narcotics transportation is strong. However, a sentence of 120 months is a

significant deterrent. The cost on U.S. taxpayers to incarcerate Mr. Lopez Mendoza outweighs the necessity of a greater punishment.

> 5. *The Need for the Sentence Imposed to Protect the Public from Further Crimes of the Defendant, Section 3553(a)(2)(C)*

Although Lopez Mendoza's choice of means by which to earn money was lamentable, he has never shown a propensity for violence or serious criminal behavior beyond this incident. The Bureau of Prisons can offer him mental health and addiction counseling which will go much further in preventing his recidivism than additional years of imprisonment. "Dollar for dollar, treatment reduces the societal costs of substance abuse more effectively than incarceration does." McVay, *supra*.

While prison does indeed prevent crime while people are locked up, once released, incarceration has, at best, a negligible impact on crime prevention and, at worst, is crime-producing. COMMUNITY CORRECTIONS COLLABORATIVE NETWORK, MYTHS & FACTS: WHY INCARCERATION IS NOT THE BEST WAY TO KEEP COMMUNITIES SAFE 10 (2016). Lengthy imprisonment without some offender specific reason not only burdens government budgets, but also fails to enhance public safety. VALERIE WRIGHT, *Deterrence in Criminal Justice: Evaluating Certainty vs. Severity of Punishment*, THE SENTENCING PROJECT, November 2010, at 9.Yet, the longer Mr. Lopez Mendoza's sentence, the more life will pass him by, he will become institutionalized, and his transition back to society will be more difficult. *See United States v. Hawkins,* 380 F.Supp.2d 143, 165 (E.D.N.Y. 2005), *aff'd,* 228 Fed.Appx. 107 (2d Cir. 2007) (concluding that incarceration "will in effect doom her.... Rehabilitation should not now be destroyed by wanton and unthinking application of mechanical rules for imprisonment.").

When prison sentences are relatively short, offenders are more likely to maintain their ties to family, employers, and their community, all of which promote successful reentry into society. Lin Song and Roxanne Lieb, *Recidivism: The Effect of Incarceration and Length of Time Served*, OLYMPIA, WA: WASHINGTON STATE INSTITUTE OF PUBLIC POLICY (1993). Conversely, when prisoners serve longer sentences they are more likely to become institutionalized, lose pro-social contacts in the community, and become removed from legitimate opportunities, all of which promote recidivism. Thomas Orsagh and Jong-Rong Chen, *The Effect of Time Served on Recidivism: An Interdisciplinary Theory*, JOURNAL OF QUANTITATIVE CRIMINOLOGY, 4(2):155-171, 1988. There is not a significant benefit to deterrence by increasing the severity of sentences by imposing longer prison terms. *See* Wright, *supra* at 9. Rather, research shows that increasingly lengthy prison terms are counterproductive. *Id*.

   6. *The Need for the Sentence Imposed to Provide the Defendant with Needed Educational or Vocational Training, Medical Care, or Other Correctional Treatment in the Most Effective Manner, Section 3553(a)(2)(D)*

Mr. Lopez's Mendoza's need for mental treatment has already been discussed, and he would take advantage of any educational or vocational training offered. Although prison may offer Mr. Lopez Mendoza opportunities to improve himself, he will likely be able to accomplish that during a sentence of 120 months. A longer sentence will only deteriorate his ability to transition back to society.

Mr. Lopez Mendoza desperately wants to be able to work during his incarceration so he can send money to his family. Not all prison facilities offer work opportunities and some give preference to U.S. citizens for open jobs. Mr. Lopez Mendoza respectfully requests the order

recommend a facility where he would have work opportunities such as Ft. Dix. If Ft. Dix is not available, an institution in Arizona or New Mexico offers the best chance for his family to ever visit him.

    7. *The Kinds of Sentences Available, Section 3553(a)(3)*

Following *Booker*, the Court is free to impose any reasonable sentence that does not fall below the mandatory minimum sentence absent a motion from the Government recognizing his substantial assistance. In that regard, the Court is likely aware of the recent circuit split regarding the application of § 3553(f) safety valve relief to MDLEA cases. In this case, Mr. Lopez Mendoza is convicted of violating 46 U.S.C. §§ 70503(a)(1), 70506 (a) and (b) and 21 U.S.C. § 960(b)(1)(B)(ii). The D.C. Circuit recently held that § 3553(f) safety valve applies in MDLEA prosecutions because, like Mr. Lopez Mendoza's conviction, it is an offense under 21 U.S.C. § 960. *See United States v. Mosquera-Murillo*, __ F.3d __, 2018 WL 4050250, *5-*9 (D.C. Cir. Aug. 24, 2018). Mr. Lopez Mendoza respectfully disagrees with the Eleventh Circuit's precedent deciding that § 3553(f) does not apply to defendants convicted under the MDLEA. *See United States v. Castillo*, 899 F.3d 1208, 1212-13 (11th Cir. 2018); *United States v. Pertuz-Pertuz*, 679 F.3d 1327, 1329 (11th Cir. 2012). Counsel does not expect the Court to rule contrary to binding Eleventh Circuit precedent, but wishes to preserve Mr. Lopez Mendoza's objection in the event the split is resolved in favor of the application of safety valve or there is a change in the law or current precedent.

    8. *The Sentencing Guidelines, Section 3553(a)(4)*

The offense level computation recommended by the Presentence Report puts Mr. Lopez Mendoza in a range of 151-188 months imprisonment. As noted, Mr. Lopez Mendoza seeks a

sentence of 120 months. Mr. Lopez Mendoza requests the Court impose a downward departure for minor role pursuant to USSG § 3B1.2, or, alternatively consider his lesser role in conjunction with other mitigating factors in awarding him a variance. Undersigned counsel is mindful that Mr. Lopez Mendoza's role is not significantly different than many similar defendants sentenced by the Court, and the Court will apply the same reasoning to his case. Nonetheless, Mr. Lopez Mendoza is requesting a sentence commensurate with similarly situated defendants who fulfilled a similar role which would require a variance or departure from his current Guideline range.

Subject to review for reasonableness, district judges are now free to apply their own perceptions of just punishment, deterrence, and protection of the public even when these differ from the perceptions of the Commission members who drew up the guidelines. *United States v. Rodriguez*, 406 F.3d 1261, 1289 (11th Cir. 2005) (Tjoflat, J., dissenting) (citing *Booker*, 125 S.Ct. at 790 (Scalia, J., dissenting)). Following *Gall v. United States*, there is no requirement of "'extraordinary' circumstances to justify a sentence outside the Guidelines range." 552 U.S. 38, 47 (2007). "[A] district judge can fairly consider policy statements concerning departures and fairly decide to impose a non-Guidelines sentence without definitively resolving close questions regarding the precise meaning or application of a departure policy statement." *United States v. Canova*, 412 F.3d 331, 358 n. 28 (2d Cir. 2005).

Pursuant to *United States v. Cruickshank*, 837 F.3d 1182 (11th Cir. 2016), a defendant in Mr. Lopez Mendoza's position is eligible for a role adjustment. The recent clarification to USSG § 3B1.2 provides that "[f]or example, a defendant who does not have a proprietary interest in the criminal activity and who is simply being paid to perform certain tasks should be

considered for an adjustment under this guideline." U.S.S.G. Supp. App. C, Amend. 794. And, as Application Note 3(A) to USSG § 3B1.2 states: "For example, a defendant who is convicted of a drug trafficking offense, whose participation in that offense was limited to transporting or storing drugs and who is accountable under §1B1.3 only for the quantity of drugs the defendant personally transported or stored, may receive an adjustment under this guideline." Those examples encapsulate Mr. Lopez Mendoza's role in this offense.

Like *Cruickshank*, while the amount of drugs in this case is substantial, "there is nothing in the record to suggest that the amount of drugs was indicative of the magnitude of [the defendant's] participation in the crime -- to the contrary, he did not load the drugs on the vessel, reconstruct the vessel, fuel the vessel, attend the planning meetings for the trip, or otherwise appear to have any role concerning the quantity of drugs." *Cruickshank*, 837 F.3d at 1195 n. 1. The amount of drugs, like nearly every aspect of this voyage, was not something over which Mr. Lopez Mendoza had any control.

Even if Mr. Lopez Mendoza's role could be considered important to the success of the venture, such a factor is not determinative. U.S.S.G. Supp. App. C, Amend. 794. Nearly every job associated with a criminal enterprise, or even a legitimate enterprise, could be considered important to some aspect of the enterprise, otherwise the job would not exist. People above Mr. Lopez Mendoza organized and funded this voyage, obtained the drugs and the boat, mapped the course, loaded the boat, determined a launching and docking spot, and recruited the people to fill the multiple jobs required to accomplish the voyage. He had no decision making authority or influence over any other person. In fact, if he had deviated in any way from the instructions

given to him, he likely would have been harmed. Mr. Lopez Mendoza played his part, but it was a small part in comparison.

> 9. *The Need to Avoid Unwarranted Sentence Disparities Among Defendants with Similar Records Who Have Been Found Guilty of Similar Conduct, Section 3553(a)(6)*

Mr. Lopez Mendoza falls within criminal history category II because he has two prior convictions for immigration offenses. As noted previously, Mr. Lopez Mendoza lived near the Arizona border and worked in the Tuscon area. He did not have the appropriate visa or immigration status to support his stay in Arizona to perform that work. Mr. Lopez Mendoza did not commit these offenses in order to further a crime or for a nefarious purpose. He was just trying to earn a living by going to where there was available work, a very common practice for residents in his area. He was punished for these offenses and served a period of imprisonment. Sentencing him to additional prison time in this case because of these offenses is excessive. The disparity created by his criminal history category between his sentence and that of similarly situated defendants is disproportionate based on the nature of his prior offenses. The immigration offenses are much different than his current offense and an increased sentence based on those offenses would not further the goals of deterrence or the protection of the public for the drug crime at issue. Courts in this District have routinely found that sentences of between 120 and 135 months are sufficient in these cases to satisfy the goals of sentencing, and Mr. Lopez Mendoza's immigration offenses do not warrant a deviation from that finding.

## III. CONCLUSION

For the reasons stated above, Mr. Lopez Mendoza prays the Court show leniency on him and sentence him to 120 months incarceration.

Respectfully submitted,


By: s/ *P. Matthew Luka*
    P. MATTHEW LUKA
    Florida Bar No. 555630
    TROMBLEY & HANES, P.A.
    707 North Franklin Street, 10th Floor
    Tampa, Florida 33602
    Telephone: (813) 229-7918
    Facsimile: (813) 223-5204
    Email: mluka@trombleyhaneslaw.com

## **CERTIFICATE OF SERVICE**

    I HEREBY CERTIFY that on this 8th day of November 2018, I electronically filed the foregoing with the clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to counsel of record.